Joseph Verner Reed and Permelia P. Reed v. Commissioner.
Reed v. Commissioner
Docket No. 46726.
United States Tax Court
T.C. Memo 1955-125; 1955 Tax Ct. Memo LEXIS 212; 14 T.C.M. (CCH) 455; T.C.M. (RIA) 55125; May 19, 1955
*212 Advances made by taxpayer to two corporations in which he was a substantial or controlling stockholder were capital contributions and losses attributable to these advances were capital losses. Frank A. Zunino, Esq., 40 Wall Street, New York, N. Y., and Vincent J. Malone, Esq., for the petitioners. Ellyne E. Strickland, Esq., and Donald J. Fortman, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent claims a deficiency in income tax in the amount of $35,485.73 for the year 1950 in this proceeding. The only issue in controversy concerns the character of advances made by the petitioner, Joseph Verner Reed, [1] to two corporations in which he was a prominent stockholder. In each case, the advances constituted the necessary money to get the enterprises under way. Both failed. The petitioner claims that the advances were loans to the corporations and he deducted the net amount of his losses as worthless business debts. The respondent disallowed the deductions. His theory *213 is that the petitioner's advances were capital contributions to the corporations and the losses, therefore, were capital losses which can be deducted only with limitations. Alternatively, the respondent contends that, if the advances were loans, then they were not made in the course of petitioner's business and the losses are non-business bad debts. Some of the facts have been stipulated. Findings of Fact The petitioners, Joseph Verner Reed and Permelia Reed, are husband and wife and residents of Greenwich, Connecticut. They filed a joint Federal income tax return for the calendar year 1950 with the collector of internal revenue for the second district of New York. Petitioners filed their Federal income tax returns on the cash basis and for the calendar year. Petitioner reported in his Federal income tax returns for the years 1946 through 1950 taxable dividends and interest and tax-exempt interests as follows: Taxable Dividends
Tax-exempt
Year
and Interest
Interest
1946
$ 86,276.85
$36,959.95
1947
92,222.60
39,159.29
1948
98,384.60
37,631.09
1949
99,829.45
40,117.93
1950
110,323.52
37,932.02
Petitioner has been a client of Barrett Associates, *214 Inc., since that firm commenced operations on May 15, 1937, and was a client of its predecessor organization, the Investment Counsel Department of Chas. D. Barney & Company, from December 1934 to May 15, 1937. Throughout the entire period of their relationship, the investments on which Barrett Associates, Inc., have been employed to advise petitioner, Joseph Verner Reed, have been held in a custody account at City Bank Farmers Trust Company, New York. The portfolio has consisted of U.S. Government and tax-exempt bonds and marketable corporate bonds and stocks. Joseph Verner Reed has had an office in New York City from 1937 to the present. Except for the years 1947 and 1948, he was listed in the Manhattan telephone directory at his office addresses. A bookkeeper kept petitioner's books of account at petitioner's office in the period from 1938 through 1945. From 1946 through 1950, petitioner's books were supervised at his office by an accountant employed by petitioner. Marweb Productions, Inc., was incorporated on April 26, 1948, under the laws of the State of New York. It was organized to form a touring theatrical company to bring Shakespearean plays to cultural centers, particularly *215 school and college communities, in the United States and Canada where the professional theater was no longer available. Marweb Productions developed from an association between petitioner and Margaret Webster (hereinafter sometimes called Margaret), a theatrical director and producer. They first were associated in 1937 when the petitioner provided a substantial portion of the $30,000 required to finance a production of "Richard II" which Margaret directed. The production was a financial success. In 1938 they were also associated in the Maurice Evans production of "Hamlet", for which the petitioner advanced funds and which Margaret directed. This production also was a financial success. The American Repertoire Theater was formed in 1946. Margaret Webster was one of the three founders and co-directors of American Repertoire and petitioner purchased approximately one-third of the $300,000 in stock issued by the venture. This venture was not a financial success. At the first meeting of the directors of Marweb Productions on April 27, 1948, the following officers were elected: President
Margaret Webster
Vice President
Joseph Verner Reed
Secretary-Treasurer
John Yorke
*216 The minutes of that meeting read in part as follows: "The question of the initial financing of the corporation's operations was then discussed and Mr. Joseph Verner Reed announced that he was prepared to advance the sum of $25,000. It was agreed that the corporation should undertake to repay this amount over five years, the indebtedness of the corporation to be represented by five (5) promissory notes bearing interest at 2% and payable respectively one, two, three, four, and five years after the date of execution thereof. It was understood that Mr. Reed would make funds available from time to time and that the corporation's notes would be executed and delivered against receipt of funds advanced. As a condition to making such a loan Mr. Reed requested the opportunity of subscribing to thirty-six (36) shares of the corporation's capital stock at 25" a share. Mr. Reed's offer was discussed and accepted." Resolutions were passed to that effect. At the same meeting, Margaret Webster offered to assign to the corporation in exchange for 34 shares of stock of Marweb Productions, Inc., an agreement between herself and Hurok Productions, Inc., under which Hurok undertook to obtain engagements *217 and bookings for productions of Hamlet and Macbeth during the 1948-1949 season. This offer was also accepted by the directors and resolutions were passed to that effect. A certificate for 36 shares of stock of the corporation dated April 27, 1948, was issued to the petitioner, Joseph Verner Reed. The petitioner paid $9 for the stock of the corporation, which was issued to him. Advances totaling $42,000 were made by Joseph Verner Reed to the corporation during the five months following incorporation and corporate notes bearing 2 per cent interest, payable one year after date, were issued to him as follows: Date
Amount
May 4, 1948
$5,000.00
June 18, 1948
5,000.00
July 9, 1948
5,000.00
July 12, 1948
5,000.00
July 14, 1948
7,500.00
Sept. 9, 1948
4,000.00
Sept. 15, 1948
6,000.00
Sept. 22, 1948
2,500.00
Sept. 27, 1948
2,000.00
The cash receipts and disbursements ledger of Marweb Productions, Inc., shows the following entry: "Cash Receipts May 1 - September 30, 1948 Notes Payable Cash
Joseph V. Reed
Capital Stock
42009.00
42000.00
9.00"
At the time of the advances, no security was given to petitioner and no interest was *218 ever paid on the notes. Marweb's plays went into production in the fall of 1948. The company toured for the two seasons, 1948-1949 and 1949-1950, traveling approximately 30,000 miles each year and performing five to six times weekly during the theatrical season. The company played in 44 states and in Canada before an audience of approximately 180,000 people each season. The company operated at a loss throughout its entire existence. The gross receipts for the 1948-1949 season were $183,664.89. The operating loss for that season was $27,619.49 and, after a loss from the sale of a capital asset in the amount of $539.86, the total loss for the year ended April 30, 1949, the first year of operations, was $28,159.35. The gross receipts for the 1949-1950 season were $175,939.82. The net loss for the second season was $24,125.41. The minutes of the meeting of the board of directors of Marweb held March 23, 1949, read, in part, as follows: "The Chairman also reported that Mr. Joseph Verner Reed had agreed to extend the maturity date of any of the corporation's note maturing before 1949 to June 1, 1950." On August 5, 1948, John Yorke resigned as secretary-treasurer of Marweb Productions *219 and Edward Choate was elected in his place. On October 21, 1948, Yorke resigned as a director and Choate was elected in his place. Margaret Webster and Edward Choate also advanced money to Marweb Productions. On May 26, 1950, pursuant to resolutions of the board of directors, the corporation executed a chattel mortgage on its Mack tractor and Freuhauf trailer in favor of the [petitioners], Margaret Webster and Edward Choate. The mortgage recited that it was to secure an obligation of $12,000 and also acknowledged that the corporation "owes additional sums, not herein mentioned," to each of the parties in whose favor the mortgage was executed. Marweb issued stock to the following in the indicated amounts for services rendered: August 5, 1948, to Selma Broder
5 shares
March 23, 1949, to Edward Choate
15 shares
March 23, 1949, to Harry L. Abbott
5 shares
Marweb Productions dissolved on December 29, 1950. At that time, the corporation had assets of $809.64 and liabilities of $62,283.59, of which $42,000 were notes payable to petitioner and $19,399.42 were loans payable to others. Reed & Stevenson, Inc., was incorporated June 22, 1946, under the laws of *220 the State of New York for the purpose of producing, reproducing and selling drawings, paintings, prints, antiques and other decorations. The primary purpose in forming the corporation was to provide fine pictures for distribution and sale at nominal prices through department stores. The idea behind the corporation orginated with Robert T. Stevenson who met petitioner in 1943 when both were in the Army. In 1946, Stevenson persuaded the petitioner that the idea was sound and the petitioner agreed to advance the necessary money to put the idea into production. Stevenson agreed to furnish the skill and experience he had in art and designing. At the first meeting of directors held July 8, 1946, the following officers were elected: President
Joseph Verner Reed
Vice-president
Robert Stevenson
Secretary
Frank Hamilton
Treasurer
Edmund Colgan
The corporation had authorized capital stock of 300 shares of the par value of $1 each. The minutes of the first meeting read, in part, as follows: "Mr. Reed thereupon offered to purchase 165 shares of the authorized capital stock of the Corporation and Mr. Stevenson offered to purchase the remaining 135 shares of the capital *221 stock of the Corporation." Upon motion duly made and seconded it was, therefore - "RESOLVED, that all of the authorized capital stock of the Corporation be issued for cash as follows: 165 shares to Mr. Joseph Verner Reed and 135 shares to Mr. Robert Stevenson, and "FURTHER RESOLVED, that the appropriate officers be, and they hereby are, authorized and directed to execute and deliver shares as aforesaid to Mr. Reed and Mr. Stevenson in exchange for cash. "Mr. Reed stated that he was prepared to advance $5,000 against the unsecured note of the Corporation, no interest to accrue during the first year of the note and thereafter the note to bear interest at 4% per annum. "After consideration of Mr. Reed's offer, it was, on motion duly made, seconded and unanimously approved "RESOLVED, that the Corporation pledged its credit to Mr. Joseph Verner Reed to the extent of $5,000 and that the appropriate officers of the Corporation be, and they hereby are, authorized and instructed to borrow $5,000 from Mr. Reed and to execute a note on behalf of the Corporation in that amount and, generally, to do all that is necessary or desirable in the premises." The corporation started in business *222 with one craftsman who framed pictures, painted mats and did other art work. More help was added as the business grew until, at the time it dissolved, the company employed a receptionist, a general craftsman and four or five additional employees for special types of work. Petitioner periodically made additional advances to Reed & Stevenson. By the end of the company's first fiscal year, June 30, 1947, he had advanced $45,000. In the company's second fiscal year, he advanced an additional $43,600; in the third fiscal year, he advanced $36,590.61 and in the fourth fiscal year, he advanced an additional $5,500 to the corporation. As of December 31, 1949, he had advanced a total of $130,690.61 to the corporation and demand notes totaling that amount and bearing 4 per cent interest were issued to him. Interest was to run starting one year after date. These notes were carried as "Notes Payable" on the company's balance sheet. No security was given for the advances and no interest was ever paid on the notes. Between February and August 1950, the corporation repaid the petitioner $44,166. At the end of the fiscal year which terminated on June 30, 1949, Reed & Stevenson's books disclosed *223 a deficit of $32,447.18. For the fiscal year ending June 30, 1950, the company had an operating loss of $44,419.45 which increased its deficit to $76,876.63. Reed & Stevenson, Inc., was dissolved November 22, 1950. At the time of dissolution, petitioner received cash and merchandise which reduced the obligations to petitioner on the books of the company to $77,922.63. The petitioner was the only creditor of the corporation at the time of its dissolution. The advances made by the petitioner to Marweb and to Reed & Stevenson were capital contributions to those corporations and not loans. Opinion ARUNDELL, Judge: The principal question in this case is whether advances made by the petitioner to two corporations were "loans" or "capital investments" for Federal income tax purposes. If the advances are found to be loans, there will remain the further question whether the loans were "business" or "non-business" debts. As our findings indicate, the moneys advanced by the petitioner to the two corporations in which he was either a substantial or controlling stockholder were characterized and treated as loans on the corporate books and carried as liabilities throughout the existence *224 of both corporations. The respondent, however, contends that the petitioner's advances were capital contributions to the corporations. The nature of the advances is important because both ventures failed and, if the advances were capital contributions, the amount of the losses which the petitioner may deduct will be severely limited. The petitioner contends that the advances were loans made in the course of his business and, therefore, he may deduct the full amount of his losses as he did on his returns. Alternatively, the respondent contends that, if the advances were loans, they were not made in the course of the petitioner's business. If the advances are worthless non-business debts, the losses are treated as short-term capital losses and are likewise allowed as deductions only to a limited extent. The determination of the character of the advances is a question of fact in which the petitioner's intent is a relevant factor. . Unfortunately, we have not had the benefit of the petitioner's own testimony in this case. He was not present at the trial. Consequently, we shall have to rely exclusively on objective factors to make our *225 determination. In a similar case, the Supreme Court observed in Talbot Mills v. Commissioner, [2], that: "There is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in * * * corporations or debts. So-called stock certificates may be authorized by corporations which are really debts and promises to pay may be executed which have incidents of stock* * *." and we have said that, in making the determination involved here, : "Bookkeeping, form, and the parties' expressions of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered, for the parties' formal designations of the advances are not conclusive * * * but must yield to 'facts which even indirectly may give rise to inferences contradicting' them." After application of the foregoing criteria to the facts of this case, we conclude that the moneys advanced by petitioner to the corporations *226 were capital contributions and not loans. So far as form and bookkeeping are concerned, there was scrupulous observance of those technical requirements to create debt instruments to represent the advances. The instruments issued to the petitioner by Marweb represented definite obligations of the corporations to repay the advances, with interest, at fixed dates and, in the case of the advances to Reed & Stevenson, demand notes, with fixed interest rates, in proper form were issued to represent the advances. At least on their face, there was no contingency concerning profitable operations which limited the maturity of the instruments or the petitioner's right to repayment. Cf. , affd. (C.A. 2, 1954) . Also, as we observed above, the advances were treated as loans on the corporate books. Therefore, as far as form was concerned, the advances had the superficial indicia of loans. "But, for tax purposes, * * * conformity to legal forms is not conclusive" in these cases. 1432 , affd. (C.A. 2) . In some important respects, there *227 were departures from the usual circumstances of a loan. The interest rates in both situations were quite nominal, considering the speculative nature of the enterprises. Although it was small, the petitioner appears to have forgiven payment of all interest. He received no interest on any of the advances. It is extremely difficult to discern from this record precisely what were the intentions and expectations of the parties concerning repayment. We know that there was apparently no attempt to enforce the obligations against either company and, indeed, the maturity dates of the Marweb obligations were extended. Because both corporations showed continuous operating losses, it is doubtful that the petitioner could have insisted on repayment according to schedule without forcing the companies out of business entirely. The episode of the chattel mortgage covering Marweb's equipment is ambiguous. The petitioner was one of three mortgagees for a total indebtedness of $12,000. Yet, when Marweb dissolved, petitioner was still a creditor according to the books to the extent of $42,000, and the loss claimed on the advances to Marweb is in the same amount which is also the total sum of his advances *228 to the corporations in 1948 and the amount claimed in this proceeding. Consequently, we cannot conclude that the mortgage indicated an intention to give security for the moneys advanced to Marweb and thus raise petitioner to the status of a secured creditor. In the last year of its existence, Reed and Stevenson made repayments to the petitioner of some of the moneys he advanced, and reduced the total advances from $130,000 to approximately $86,000. However at the time the corporation was dissolved, the petitioner still had $77,000 in the business after a small payment on dissolution. We cannot determine anything conclusive concerning the intention or expectation of repayment from these facts. The fact that the petitioner received some of his money back is offset by the fact that he was the only listed creditor of the company at the time of its dissolution. Perhaps the most significant aspect of this case is that the petitioner's advances were made to the corporations in their formative stages, before they had any earnings to sustain them, or profits to carry them on or any credit standing from previous operations. The advances to Marweb were made in the spring and summer of 1948, *229 even before it began its initial tour. Those to Reed and Stevenson were made over 3 1/2 years but these were the beginning years of the business and, although the company had some receipts in that period from the sales of its product, without the advances, the company would not have continued operations as long as it did. Thus, these advances were necessary to establish new businesses and partake more of the nature of capital than loans. As it has been said, "Advances for such a purpose are by their very nature placed at the risk of the business * * *" [3] which is certainly more characteristic of capital or equity contributions than debt or loans. The facts here are quite similar to those in (Jan. 20, 1955) where we held that advances to a newly formed corporation where there was little paid-in capital were, in fact, capital contributions. In this connection, the observation we made in , affd. , is particularly pertinent: "When the organizers of a new enterprise arbitrarily designate as loans the major portion *230 of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business." What we have said above is sufficient to dispose of the case on the respondent's initial theory. However, even if we were to approach this case from his alternative theory, we would sustain him because we think that the evidence fails to establish that the "loans" to the two corporations were made in the course of the petitioner's trade or business. In other words, we are unable to find sufficient facts to conclude that the petitioner was in the business of lending money or of financing individuals, partnerships and corporations through loans at interest or that the loans were proximately related to whatever other activity was his business. Of course, for the petitioner to prevail, we must make such findings. , affd. per curiam (C.A. 3) ; ; . There was offered in evidence a sheaf of ledger sheets puporting *231 to record petitioner's financing and lending transactions during the significant period. These ledger sheets bear cryptic titles such as "Interest Received - Miscellaneous," "Sundry Loans," and "Notes Receivable." The latter group includes the ledgers on which are recorded the advances to the two corporations which are involved in this proceeding. This latter group also contains ledger sheets recording transactions with a number of other individuals and entities. Some of the transactions in this group are neutrally or ambiguously labeled "Advances"; others are labeled "Loans;" one is called a "Mortgage;" another is entitled an "Investment." Thus, some transactions appear to look like loans and some like capital investments, but it is impossible to tell one from the other on the basis of these records alone. All these transactions appear to be grouped with the ledger sheets recording the advances to Marweb and Reed & Stevenson. As we observed above, the petitioner did not testify and none of the witnesses who did was able to detail the specific nature or fill in the background of the transactions on these ledgers except generally. The only exception to this was the testimony concerning *232 the mortgage loan on the home of petitioner's business advisor. The personal relation of the parties was such that a broad conclusion may not be drawn from this transaction that petitioner was in the business of lending money. Therefore, even if we were to conclude that the advances to Marweb and Reed & Stevenson were loans as they were technically called, we would be unable to find that these loans were made in the course of petitioner's business and this failure of proof would have the same tax consequences as our determination that the advances were capital contributions. Thus, as we view the facts, the petitioner has failed on both theories. First, we think that the advances to the two corporations were in the nature of capital contributions and losses attributable to them are capital losses and, second, assuming that the advances were loans, the petitioner has failed to prove that the loans were made in the course of his business. Decision will be entered under Rule 50. Footnotes
1. Although a joint return was filed by Joseph and his wife, Permelia Reed, and both are petitioners, for convenience we shall refer only to him.↩
2. Also, John Kelley Co. v. Commissioner.↩
3. .↩